UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHNSON AUTOMOTIVE SALES, LLC, | Case No. 1:21-cv-00852 |
| Plaintiff and Counterclaim Defendant, | Judge J. Philip Calabrese |
| v. | Magistrate Judge Jennifer Dowdell Armstrong |
| STEVE BLAIR, | |
| Defendant and Counterclaim Plaintiff, | |
| v. | |
| CHRISTOPHER JOHNSON, | |
| Third-Party Defendant. | |

## OPINION AND ORDER

Central to this case is a website, PeakAutoSales.com. The name of the site alone may suggest that it belonged to Johnson Automotive, LLC, which does business as Peak Auto Sales. The contents of the website, however, did not flatter the car dealership's owner, Christopher Johnson. Anyone who visited PeakAutoSales.com would have realized that it was a "gripe site" designed to paint Mr. Johnson, and by extension his business, in a negative light by drawing attention to criminal charges against him. Steve Blair, the defendant in this case, owns the website and published that information as part of an ongoing feud between him and Mr. Johnson. This litigation is the latest installment in that feud. Johnson Automotive sued Mr. Blair

alleging violations of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125, trademark infringement, 15 U.S.C. § 1114, and several claims that arise under Ohio law. (ECF No. 1.) Defendant counterclaimed that Johnson Automotive violated an existing settlement agreement between the parties and initiated this lawsuit for improper purposes. (ECF No. 20.)

Defendant moves for summary judgment. (ECF No. 26.) For reasons that follow, the Court **GRANTS IN PART** the motion with respect to the federal claims and **DISMISSES** all remaining State-law claims **WITHOUT PREJUDICE**.

## STATEMENT OF FACTS

Construing the evidence in favor of Johnson Automotive as the non-moving party, the record establishes the following undisputed facts at this stage of the proceedings.

### A. The Parties' Relationship

Defendant Steve Blair performs custom work on cars under the name Gothic Customs and Restorations. (ECF No. 26-1, ¶ 1, PageID #135.) Mr. Blair is a former business partner of Christopher Johnson, the principal owner of Johnson Automotive Sales, LLC, and third-party defendant here. (*Id.*; *see also* ECF No. 26-2, PageID #145.) Plaintiff Johnson Automotive is a car dealership in Ohio that does business as Peak Auto Sales. (ECF No. 28, PageID #173.) In February 2018, Johnson Automotive registered the tradename Peak Auto Sales. (*Id.* (referencing a filing with the Secretary of State that Plaintiff did not include in the record).)

A third party brought a lawsuit against Mr. Blair and Mr. Johnson in the Medina County Court of Common Pleas. (ECF No. 26-2, PageID #145.) The parties

ultimately settled their dispute. (*Id.*) In the settlement agreement resolving that litigation, executed on October 24, 2018, Mr. Blair transferred to Johnson Automotive his ownership interest in an entity called Medina Collision Center, LLC. (*Id.*) In return, Mr. Blair received the "sole legal right to . . . any name which includes the word 'Gothic,' as related to automobile body work or restoration." (*Id.*, PageID #148.) Mr. Johnson agreed "not [to] use such name or any name" that is "deceptively similar." (*Id.*)

B.  **Events Leading to This Lawsuit**

According to the counterclaim, Mr. Johnson reneged. (ECF No. 20, ¶¶ 4 & 5, PageID #73; *see also* ECF No. 26-1, ¶ 14, PageID #137 (incorporating the counterclaim and supporting documents for purposes of Rule 56(c)(4)).) The Medina Collision Center Facebook page continued to read, "Welcome to Gothic[ ]customs & Restorations!" (ECF No. 20, ¶ 28, PageID #77; ECF No. 20-4, PageID #103.) And Johnson Automotive renewed the rights to the tradenames "Gothic Customs" and "Gothic Customs & Restoration." (ECF No. 20, ¶¶ 21 & 22, PageID #76; ECF No. 20-2, PageID #94; ECF No. 20-3, PageID #98; *see also* ECF No. 26-1, ¶ 6, PageID #136.)

Previously, on March 9, 2018, but about ten days after Johnson Automotive registered the tradename Peak Auto Sales, Mr. Blair bought four domain names: (1) JohnsonAutomotiveDBATownAutoSales.com, (2) JohnsonAutomitveGroup.com, (3) JohnsonAutomotiveLLC.com, and (4) PeakAutoSales.com. (ECF No. 26-1, ¶¶ 7 & 8, PageID #136; ECF No. 26-3, PageID #161.) This dispute involves the fourth of these websites, which Mr. Blair bought so that Johnson Automotive could not use it

3

because Mr. Johnson was using the "Gothic" name of Mr. Blair's business. (ECF No. 26-3, PageID #163.) On the PeakAutoSales.com website, Mr. Blair published public information pertaining to a criminal case against Mr. Johnson—a two-count indictment for grand theft that a grand jury returned in 2019. (ECF No. 26-1, ¶ 9, PageID #136; ECF No. 26-1, PageID #141–42.) Superimposed over an image of hands in cuffs, the homepage of the website read:

> KNOW THE TRUTH ABOUT CHRISTOPHER A JOHNSON
>
> OWNER OF PEAK AUTO SALES & MEDINA COLLISION CENTER
>
> PUBLIC RECORD
> * CAN YOU TRUST THIS MAN?
> * REVIEW THE FACT

(ECF No. 26-1, ¶ 10, PageID #138.) It also included a police-blotter newspaper story of Mr. Johnson's arrest, images of public documents relating to the charges, and a screenshot from the State court's public docket. (*Id.*; *id.*, PageID #138–144.) The website included no advertisements, links, or external references to Mr. Blair in general or his business in particular. (*Id.*, ¶ 11, PageID #137.) That content remained on the website from January 2019 through April 2021, when Mr. Blair shut the site down. (*Id.*, ¶¶ 9 & 13, PageID #136–37.) In a deposition in connection with the litigation in State court, Mr. Blair testified that he posted the content so the public can "make their . . . own decisions if you can trust that guy" and that he targeted customers of Peak Auto Sales. (ECF No. 26-3, PageID #154 & #156.)

4

## STATEMENT OF THE CASE

Johnson Automotive filed suit against Mr. Blair, alleging that his use of the PeakAutoSales.com domain constituted illegal cybersquatting, unfair competition, intentional interference with its business, dilution of business, and trademark infringement. (ECF No. 1.) Mr. Blair counterclaimed against Johnson Automotive and crossclaimed against Mr. Johnson that the ongoing use of the Gothic name breaches their settlement agreement and that bringing this lawsuit amounted to unfair competition and abuse of process. (ECF No. 20.)

Initially, the parties consented to the exercise of jurisdiction by the Magistrate Judge. (ECF No. 14.) When the Magistrate Judge retired, the case was returned to the active docket of the undersigned, and the Court scheduled a status conference at Plaintiff's request. (Notice, Sept. 2, 2022; Order, Oct. 26, 2022.) After Plaintiff's counsel failed to appear (*see* ECF No. 24), Defendant requested the opportunity to file a motion for summary judgment, and the Court set a briefing schedule. (Minutes, Nov. 10, 2022.)

## ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville*

*Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586.

On summary judgment, the central inquiry "determin[es] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Generally, a district court "will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter." *Kermavner v. Wyla, Inc.*, 250 F. Supp. 3d 325, 329 (N.D. Ohio 2017) (citing *Anderson*, 477 U.S. at 249). A district court only examines "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative,"

6

summary judgment for the movant is proper. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

## I. Anti-Cybersquatting Consumer Protection Act

Plaintiff alleges that Mr. Blair registered domain names and operated the PeakAutoSales.com website in violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). (ECF No. 1, PageID # 4.) "Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000). To combat this conduct, the Anti-Cybersquatting Consumer Protection Act aims to protect "consumers from slick internet peddlers who trade on the names and reputations of established brands." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004).

By its terms, as relevant here, the Act provides trademark owners a right of action against a person who, with "a bad faith intent to profit," "registers, traffics in, or uses a domain name" that is "identical or confusingly similar" to a distinctive or famous trademark. 15 U.S.C. §§ 1125(d)(1)(A)(i) & (ii). Liability also arises where a defendant "intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website," *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1058 (10th Cir. 2008); *DaimlerChrysler v. Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004).

7

To establish a claim, a plaintiff must show: "(1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to . . . the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." *DaimlerChrysler*, 388 F.3d at 204.

### I.A. Bad Faith Intent to Profit

"In determining whether a person has a bad faith intent" to profit within the meaning of the Act, the statute identifies a non-exclusive list of nine factors for consideration. 15 U.S.C. § 1125(d)(1)(B)(i). These factors "are given to courts as a guide, not as a substitute for careful thinking about" the defendant's conduct. *Lucas Nursery*, 359 F.3d at 811.

### I.A.1. Reasonable Basis for Registration

The first four provide some reasonable basis a defendant might have registered a domain and so not have acted with a bad faith intent to profit. *Lucas Nursery*, 359 F.3d at 809. These four factors are:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name[.]

8

15 U.S.C. § 1125(d)(1)(B)(i). Of these considerations, the first three favor Plaintiff. Mr. Blair had no intellectual property rights in the PeakAutoSales.com domain name, which was not commonly used to identify him or his business. He only ever used this website to post "publicly available information about" Mr. Johnson's case. (ECF No. 26-1, ¶ 9, PageID #136.)

As for the fourth factor, whether Mr. Blair had a "bona fide noncommercial or fair use," the record shows that Mr. Blair created the website out of spite to seek revenge against an ex-partner with whom he was involved in a contentious business divorce. (ECF No. 20-2, PageID #94; ECF No. 20-3, PageID #98.) But creating "a non-commercial gripe site" is not illegal. *TMI, Inc. v. Maxwell*, 368 F.3d 433, 434 (5th Cir. 2004). What matters most under this factor is the noncommercial nature of Mr. Blair's conduct. The website included no links or references to other commercial cites, no advertisements, and no admonitions to bring one's business to a competitor. (ECF No. 26-1, ¶ 11, PageID #137.) Mr. Blair took no additional steps to promote the website through search optimization or other means of drawing in visitors. (*Id.*)

Johnson Automotive characterizes Mr. Blair as commercially motivated. (ECF No. 28, PageID #179.) Plaintiff argues that Mr. Blair devised his website to divert customers from Peak Auto Sales and harm a direct competitor. Nothing in the record, however, suggests that Mr. Blair used the domain to promote his own businesses. Mr. Blair's identity, references to his business, and the "Gothic" name are absent from the website. Construed in favor of Johnson Automotive, the record shows that Mr. Blair acted out of personal animus in a way that might, indirectly, have secondary

9

commercial consequences. In *Lucas Nursery*, where the website disparaged the landscaping services that the plaintiff provided, the Sixth Circuit still recognized that this factor cut in the defendant's favor "because the site was used for noncommercial purposes." 359 F.3d at 809. To the extent Mr. Blair's personal attacks on Mr. Johnson might have a negative effect on Johnson Automotive, any such claim is too tenuous and speculative to tilt this consideration in favor of Plaintiff. At best, this factor is neutral. But overall, on the record presented, these factors favor Plaintiff in showing that Mr. Blair lacked a reasonable basis for the registrations at issue.

### I.A.2. Bad Faith

The next four factors go to the bad faith of the defendant. *Lucas Nursery*, 359 F.3d at 809. They examine:

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time

of registration of such domain names, without regard to the goods or services of the parties[.]

15 U.S.C. § 1125(d)(1)(B)(i).  The Court analyzes each in turn.

## V.

Plaintiff argues that Mr. Blair's use of the PeakAutoSales.com domain intended to divert customers and harm Johnson Automotive's goodwill.  Its reliance on *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032 (D. Kan. 2006), and *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661 (S.D.N.Y. 2018), is misplaced.  In *Sunlight Saunas*, "the website even included direct links to competitors[']" websites, which factored into the court's rejection of an argument that the website at issue was a noncommercial gripe site.  427 F. Supp. 2d at 1057.  The presence or absence of a commercial link represents a critical factor in assessing the commercial nature of a website under the Lanham Act.  *See Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003).  Unlike in *Sunlight Saunas*, Mr. Blair included no link on the website he created at the PeakAutoSales.com domain.

Similarly, in *McAllister Olivarius*, the defendant "sought to profit by diverting customers to his website and then offering to plaintiff that he would refrain from posting true but purportedly damaging documents on that domain name for a price."  298 F. Supp. 3d at 675.  Mr. Blair had the opportunity to do the same, but the record shows that he took down the website when the State-court litigation began.  (ECF No. 26-1, ¶ 13, PageID #137.)  In other words, Mr. Blair refrained from taking the very action that allowed the plaintiff to state a claim for bad faith intent to profit in *McAllister Olivarius*.

11

Moreover, this factor requires a likelihood of confusion. On this record, construed in Plaintiff's favor, as a matter of law, the information Mr. Blair posted on the domain at issue presents *no* risk of confusion. No reasonable consumer or participant in the market would think that Johnson Automotive created or endorsed the content on the site. Further, other than identifying Mr. Johnson as the owner of Peak Auto Sales, the website mentioned nothing about cars. No visitor to PeakAutoSales.com would be left with the mistaken impression that Mr. Johnson "sponsored a site criticizing himself." *Lamparello v. Falwell*, 420 F.3d 309, 315 (4th Cir. 2005); *see also id.* at 320 (applying its likelihood of confusion analysis for trademark infringement to the fifth bad-faith factor); *Utah Lighthouse Ministry*, 527 F.3d at 1058–59. In publicizing truthful yet derogatory information about the principal owner of Johnson Automotive, the site made obvious that its operator was anyone *other than* the car dealership itself.

## VI.

The sixth factor, dealing with attempts at "financial gain" without a "bona fide offer[] of any goods or services," 15 U.S.C. § 1125(d)(1)(B)(i)(VI), gets to the heart of the Act's purpose. "Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy" in the Act. *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (2003). Mr. Blair did not "offer to transfer, sell, or otherwise assign the domain name to the mark . . . for financial gain." 15 U.S.C. § 1125(d)(1)(B)(i)(VI). Mr. Blair attests that he "did not ever solicit money or consideration from Plaintiff for provision of access to the domain names" (ECF No. 26-1, ¶ 8, PageID #136), and nothing in the record

suggests otherwise. Indeed, Mr. Blair shut down the website when litigation commenced in State court. (*Id.*, ¶ 13, PageID #137.) Even with the opportunity and incentive, Mr. Blair did not use the website as a financial bargaining chip. This undisputed fact removes Mr. Blair's actions from the core of the congressional purpose in the statute and strongly favors Mr. Blair. *See Lucas Nursery*, 359 F.3d at 810 ("There is no evidence that this was [the defendant's] intention when she registered the Lucas Nursery domain name and created her web site. It would therefore stretch the [Act] beyond the letter of the law and Congress's intention to declare anything to the contrary.").

## VII.

Contrary to Plaintiff's claim, Mr. Blair did not provide "material and misleading false contact information when applying for the registration of the domain name" or fail "to maintain accurate contact information" within the meaning of the statute. 15 U.S.C. § 1125(d)(1)(B)(i)(VII). The complaint alleges that Mr. Blair "registered the domain name with privacy protection to hide his identity as the owner." (ECF No. 1, ¶ 12, PageID #3.) But that is not the conduct the seventh factor identifies as indicative of bad faith. This factor concerns intentionally misleading, which involves a degree of deceit that far exceeds Mr. Blair's choice to withhold personal information. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25A:60 (5th ed. Dec. 2022). Notwithstanding this action, the record shows that Johnson Automotive never doubted the identity of the proprietor of PeakAutoSales.com. This factor also cuts against a finding of bad faith.

## VIII.

In addition to PeakAutoSales.com, Mr. Blair registered three other domain names, each resembling Johnson Automotive's brand name: (1) JohnsonAutomotiveDBATownAutoSales.com, (2) JohnsonAutomitveGroup.com, and (3) JohnsonAutomotiveLLC.com. (ECF No. 26-1, ¶ 7, PageID #136.) Although this number of registrations indicates bad faith on the face of the statute, the facts in the record tell a different story under the law of this Circuit. In *Lucas Nursery*, 359 F.3d at 810, the Sixth Circuit distinguished *Toronto-Dominion Bank v. Karpachev*, 188 F. Supp. 2d 110 (D. Mass. 2002). In *Karpachev*, the defendant "registered sixteen domain names" related to the bank TD Waterhouse. 188 F. Supp. 2d at 111. On the website for each domain name, the defendant "excoriate[d]" the bank, accusing it of "webfacism" and "white collar crime." *Id.* at 111–12. The court held the defendant liable under the Act. *Id.* at 114. In contrast, the Sixth Circuit in *Lucas Nursery* noted the central distinction that, unlike in *Karpachev*, the defendant "did not register multiple web sites; she only registered one." 359 F.3d at 811.

Here, Mr. Blair *registered* four domain names, but used only one. The others he let expire without adding content to the associated website. Functionally, this conduct falls closer to that in *Lucas Nursery*. And unlike in *Karpachev*, where "[c]onfusion was [the defendant's] sole purpose in selecting the domain names," 188 F. Supp. 2d at 114, the record shows no risk of that here. On the other hand, Mr. Blair's registration of four domain names preempted Johnson Automotive's ability to secure the names for its business. In the current procedural posture, this factor is neutral or tips slightly in favor of Plaintiff.

\* \* \*

Overall, these factors cut against a finding of bad faith on the part of Mr. Blair within the meaning of the Act. Operation of a gripe website using the name of a former business partner, without more, does not establish bad faith intent to profit. To be sure, Mr. Blair acted out of spite and out of bad motivations, but these statutory considerations show an absence of an intent to profit.

### I.A.3. Distinctive or Famous Mark

The ninth factors considers:

> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i). The parties provide little argument on this score, so the Court gives it little weight. However, the Court notes that (1) Peak Auto Sales and Johnson Automotive are not necessarily the most famous or distinctive marks, but (2) the record leaves no question that the information Mr. Blair posted at the PeakAutoSales.com website is directed at Mr. Johnson and his businesses.

### I.A.4. Other Considerations

As noted, the nine factors listed in the statute constitute a non-exhaustive list of the sorts of considerations a court may analyze to determine whether a defendant acts with a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i). On this record, two additional factors come into play.

First, the parties are former business partners engaged in a messy separation that has now resulted in two lawsuits. Mr. Blair contends that Mr. Johnson has breached the terms of the settlement agreement ending the first case by using

15

Mr. Blair's business name, "Gothic," without permission. (ECF No. 20, ¶¶ 28 & 32, PageID #77.) The record leaves no doubt that their history animates this dispute. It shows why Mr. Blair purchased the domain names and published derogatory information on the PeakAutoSales.com website. In Mr. Blair's words, "He owned mine, I own his." (ECF No. 26-3, 60:9, PageID #153.) Two wrongs do not make a right. But on this record no reasonable jury could find that Mr. Blair intended to profit financially.

Second, posting personal attacks and complaints on a gripe site does not, as a matter of law, present the sort of intent to profit that the Anti-Cybersquatting Consumer Protection Act seeks to prevent. *Lucas Nursery*, 359 F.3d at 811; *see also TMI*, 368 F.3d at 440; *American Univ. of Antigua College of Med. v. Woodward*, 837 F. Supp. 2d 686, 694 (E.D. Mich. 2011) (determining that creating a website "for the sole purpose of 'cyber-griping' is not the type of activity made illegal by the [Act]"). Accordingly, allowing this claim to proceed would effectively extend the Act beyond the conduct Congress sought to proscribe.

Overall, the Court's analysis remains focused on careful thinking about Defendant's conduct and whether it exhibits a bad faith intent to profit. *See Lucas Nursery*, 359 F.3d at 811. Consideration of the statutory factors "is not" simply "a counting exercise." *See Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 679 (6th Cir. 2016). In this respect, the record shows that Mr. Blair never displayed any inclination toward financial gain from his use of the PeakAutoSales.com website. *Id.* § 1125(d)(1)(B)(i)(VI). The statutory factors and the record as a whole preclude a

16

finding that Mr. Blair acted with a covert profit motive or with a bad faith intent to profit. Bad faith, to be sure. But not an intent to profit.

### I.B. Additional Elements

Because of this determination, the Court need not consider the remaining elements of Plaintiff's claim. As a matter of law, Defendant cannot be held liable under the Anti-Cybersquatting Consumer Protection Act because he has not acted with a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(A)(i).

For the same reason, the Court need not reach Mr. Blair's argument that the statutory safe harbor in 15 U.S.C. § 1125(d)(1)(B)(ii) shields him from liability or that the imposition of liability under the Act would violate the speech protections of the First Amendment. (ECF No. 26, PageID #127.)

### II. Lanham Act

Plaintiff also brings a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114. Under the law of this Circuit, "the Lanham Act is constitutional because it only regulates commercial speech." *Taubman*, 319 F.3d at 774. "Infringement claims are subject to a commercial use requirement." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005). For the reasons already explained, Mr. Blair's use of PeakAutoSales.com had, at most, a *de minimis* commercial aspect as a matter of fact. In the parlance of the Lanham Act, Mr. Blair's use of Johnson Automotive's mark was not "in connection with the sale, offering of sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(a)(1)(a). To the contrary, Mr. Blair's use of the domain affirmatively avoided any commercial

17

aspect and was borne of spite. Accordingly, Defendant is entitled to a judgment as a matter of law.

### III. Remaining Claims and Counterclaims

Plaintiff brings additional causes of action under State law for unfair competition, intentional interference with business, and dilution of business. (ECF No. 1.) For his part, Defendant counterclaims that Plaintiff engaged in unfair competition, abuse of process, and breached their settlement agreement. (ECF No. 20.) On those claims, Defendant names Mr. Johnson as a third-party defendant. (*Id.*) But the Court need not resolve those issues. Instead, the Court "may decline to exercise supplemental jurisdiction over a claim" where, as here, it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because Defendant is entitled to summary judgment on Plaintiff's claims arising under federal law, the Court declines to exercise supplemental jurisdiction over the parties' claims and counterclaims arising exclusively under State law. Ordinarily, it is improper for a federal court to decide such claims, *Rouster v. County of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014) (citation omitted), and "there is a strong presumption in favor of dismissing" them, *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 538–39 (6th Cir. 2010). No circumstances of this case rebut that presumption. Notions of comity and federalism dictate that an Ohio court is better suited to decide those claims and counterclaims, which no longer provide a basis for federal jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Defendant's motion for summary judgment—specifically, the Court **GRANTS** summary judgment in favor of Defendant on Plaintiff's claims arising under federal law—and **DISMISSES WITHOUT PREJUDICE** the State-law claims that Plaintiff and Defendant-Counterclaimant assert.

**SO ORDERED.**

Dated: February 24, 2023

*/s/ J. Philip Calabrese*
_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio